UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 05 2013 ★

LONG ISLAND OFFICE

-------------------------------------------

CHARLES WILLIAMS,
BLACK HAND ENTERTAINMENT,
         Plaintiffs

v

VIACOM, INC., BET NETWORKS, A&E
TELEVISION NETWORKS, I TUNES CORPORATE/APPLE
COMPUTER INC, NETFLIX CORPORATE, A.SMITH &
CO. PRODUCTIONS,
         Defendants

-------------------------------------------

CV-13-1459(JS)(ETB)

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Now comes Plaintiffs, Charles Williams and Black Hand Entertainment, in opposition to Defendant's Viacom and A & E Television Networks, May 16th, 2013 motion to dismiss in the above captioned matter. Defendant's motion should be denied for the following reasons:

SERVICE OF COMPLAINT

1. The Plaintiffs' complaint was properly served in compliance with the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of New York, and the Judges' Individual Practice Rules as it relates to Pro Se, and forma pauperis status Plaintiffs. See the Court's memorandum and order dated April 9, 2013 with directions of service of summons and complaint by the United States Marshall. In that motion the Court also referenced Mc Eachin v Mc Guinnis, 357 F.3d 197, 200 (2d Cir.2004) stating that "dismissal" at this early juncture is not supported.

FAILURE TO STATE A CLAIM

2. Plaintiffs have sufficiently stated enough facts to support and establish a plausible entitlement to relief. Plaintiffs were not and are not required to address or include in the complaint any argument as it was a Performance (Interview) agreement and not a Story Right or Story Copyright agreement. Additionally, the Release agreement is a matter outside the pleading, and it should not be considered pursuant to F.R.C.P. 12(d). Plaintiffs clearly state a claim of copyright infringement. Plaintiffs concedes they may not articulate the claim as eloquent as a professional versed in legal terms, however, the facts are clearly expressed. Plaintiff is a layman and in Pro Se status and should not be penalized by dismissal. See Mawhinney v Henderson 542 F2d 1, 4-6 (2d Cir. 1976). Also see Plaintiff's affidavit attached as Exhibit 1 which may help better articulate his claim and the facts.

RECEIVED
JUN 0 5 2013
EDNY PRO SE OFFICE

3. Plaintiffs' complaint on its face states a claim beyond a doubt, and Defendants motion fails to establish that Plaintiffs can prove no claim. The Supreme Court in Conley v Gibson, 355 US 41 (1957) provides a broad reading of the short statements required in civil complaints and held that a Court is obligated to construe a Pro Se Plaintiffs' pleading liberally and in the Plaintiffs' favor. At the very least, Plaintiffs should be granted the opportunity to amend the complaint if the Court finds the complaint is lacking. Haines v Kerner 404 US 579 (1972), Moorish Science Temple of America, Inc v J. Smith 693 F2d 987 (2d Cir. 1982). Plaintiffs' attached exhibits in the complaint makes the claim clear and possible to prevail, and satisfies the Supreme Courts more stringent interpretation of plausibility held in Bell Atlantic Corp v Twombly 550 US 544 (2007) which the Defendants have here relied in their motion to dismiss.

4. Plaintiffs' complaint will gain more specificity prior to trial during the discovery process. Plaintiffs have already stated a cognizable claim and articulated facts that are not impossible to prove. Plaintiffs have proffered sufficient proofs of material "issues of facts". See Chance v Armstrong 143 F2d 698 (2d Cir. 1998), Larkin v Savage 318 F3d 138 (2d Cir. 2003). Plaintiffs have requested a trial by jury and Defendants are attempting to circumvent this and the discovery process by their less than convincing argument in their motion to dismiss. If Defendant's motion were to be granted, Plaintiffs would be denied due process of the law, and Defendant's would have avoided this Court's April 2, 2013 order pursuant to 28 USC 636 (b)(1)(A).

OWNERSHIP OF VALID COPYRIGHT

5. Plaintiffs holds two (2) valid copyright registrations with the Library of Congress, and also holds two valid registrations with the Writer's Guild of America, which both agencies are the custom and standard to protect intellectual property. This action and Plaintiffs' prior compensation for his story rights are relevant and demonstrate the facts, intent, and expectations of Plaintiffs as to seeking protection and fair compensation historically throughout the creation of the intellectual property. The Copyright Act was created to stimulate and reward individuals for their copyright whether fiction or non-fiction. For some reason, Defendants believe they are entitled to profit off what is clearly Plaintiff's, Charles Williams, story (whether fact or fiction or both) and that Plaintiff, who registered a copyright for the story is only entitled to one dollar($1.00) compensation for his performance (as "Artist"), and nothing for his registered copyright. Plaintiffs may not be able to fully express this in legalese, however, Plaintiffs' here submits this is unfair in any language or mathematics. The guts of the copyright law under the Constitution, are designed to protect and assure a contributor or owner to a copyright get a fair return for their labor. The exclusive nature of the Copyright Act gives the copy owner the right to seek payment from others who use copyrighted work. DC Comics, Inc. v Reel Fantasy, Inc. 696 F2d 24 (2d Cir. 1982). Plaintiff filed with the Writer's Guild of America East, and with the Library of Congress, negotiated film deals through counsel, holds story treatments, story outlines, pitch sheets, and business plans outlining earning expectations. Additionally, a previous agreement with Defendant, Black Entertainment Television acknowledges Plaintiff is in the business of film production and states equal treatment will be given. See Exhibits 1 to 4. Taking all of the aforementioned into consideration it is clear not only that Plaintiff had a tangible expression that he wanted to protect, but that Plaintiff expected to be fairly compensated for his story, and that Defendants were aware Plaintiff was not an "Artist" or actor, and in the business of film production. As such, plaintiff has a valid copyright claim, as well as, unfair business practice, and

breach of contract claims. Finally, Black Hand Entertainment has no performance agreement with Defendants.

CLAIM OF COPYING.

6. The American Gangster episode was copied from Plaintiffs' registered copyrighted work. Copies of Plaintiff's, Charles Williams, story was in industry circles and Defendants, prior to any "performance" agreement had, in their possession, registered material that belonged to Plaintiffs. Now Defendants wants the Court to believe Plaintiff's story just dropped out of the air into their hands. Ving Rhames' narration of the episode was scripted, that script was copied from Plaintiff's registered copyright. Defendants did not do any independent development or verification of any elements of Plaintiff's story. The copyright material and the episode are not all facts, (opposed to what Defendants allege is history), and share those identical points of fiction. The fiction was created by Plaintiff. Plaintiffs demanded a jury trial, and Plaintiffs are not required to try their case at this time, as Defendants are attempting through the allegations in these motions. Defendants are attempting to skip pass the discovery process in the proceedings. Defendants have not submitted anything detailing historical facts, and their story was copied from Plaintiffs' copyrighted material.

CLAIM FOR UNFAIR BUSINESS.

7. Defendants are alleging Plaintiff did not state a claim of unfair business practice. Plaintiff incorporates paragraph 5 and 6 here. Defendants did not exercise due diligence and are obviously unaware of their previous agreement dated December 24, 2002, with Plaintiff. See Exhibit 2. The agreement was in perpetuity and Defendants have violated that agreement by not fairly compensating Plaintiff and by not giving Plaintiff equal treatment as every other producer. While Defendants make it a point to highlight Plaintiff's history of taking from people, (which behavior Plaintiff has been held accountable and paid dearly in years of his life). It appears Defendants have their own history of taking from people. Ringgold v Black Entertainment Television, Inc. 126 F3d 70 (2d Cir. 1977). Defendants mistakenly or intentionally avoid Plaintiff real argument. Plaintiff is not arguing that Defendants "<u>violated his rights by portraying him in the documentary</u>", in Defendants words. Plaintiff is not seeking relief from his performance, performance pay, or the performance agreement. Performance is not the issue here. Plaintiff brings this action for violating the use of a valid registered copyright without compensation, for unfair business practice in violating and breaching Defendants' prior December 24, 2002 agreement. Plaintiff again concedes he may not be using proper legal jargon, but Plaintiff clearly states a claim. Perhaps, an example will help articulate my point to Defendants. There is a recent film "Argo". Ben Affleck, who is a director, "actor", "producer", and "screenwriter". Ben Affleck directed the film, and acted in the film. Affleck was compensated for two separate roles. Tyler Perry, another popular film producer, often screen writes, and acts in his own productions, which are usually produced by his production company. Tyler Perry does multiple tasks and is compensated at each point. This is the industry standard and custom. There is no blanket compensation takes all. Plaintiff submits a letter dated September 21, 2000, from his attorney at the time as Exhibit 3, to demonstrate Plaintiff was involved in negotiations for his story/copyright years before American Gangster. Plaintiff was clearly aware of his story's worth. Also clear from the letter is that Plaintiff sought compensation as producer. Contrary to what

Defendants believe, this is relevant and shows Plaintiffs are in the business of film production, and that Defendants action, in total, affects Plaintiffs' ability to market his copyright by releasing and distributing his story worldwide. (Black Hand Entertainment has no Performance Agreement with Defendants.)

RELEASE FORM DOES NOT EXONERATE DEFENDANTS.

8. The performance agreement has nothing to do with this claim. The agreement is exactly what it says, a "performance" agreement/waiver. This is a general form used in the production of music videos. This form clearly states at the top "Artist". This general form is used and is signed by most persons who appear on camera whether a speaking role or not. This form is given usually on location (site of filming), and without the assistance or review by an attorney. This is not even a union agreement. Plaintiff is not seeking acting royalties, or payment for appearing/acting in the documentary. This form was signed by everyone who appeared, and none were the subject of the production. This standard form is not relevant to the copyright claim.

Wherefore, for all the above reasons, Defendants Viacom and A & E Television Networks' motion to dismiss should be denied.

Dated: June 5, 2013

CHARLES WILLIAMS,
BLACK HAND ENTERTAINMENT,
Plaintiffs

CHARLES WILLIAMS AFFIDAVIT

## AFFIDAVIT

I, Charles Williams, being duly sworn, depose, and says :

1. I am the Plaintiff in the federal litigation 13-CV-1459 (JS)(ETB)

2. That I was given the complaint instructions by and filed my complaint at the Pro Se office in the United States District Court for the Eastern District of New York.

3. I followed the instructions to the letter in filing my complaints, and it was accepted as complete by the Pro Se office.

4. That I also filed to proceed In Forma Pauperis in the filing of this civil action.

5. That I was approved for this status by memorandum and order dated April 9, 2013, and the United States Marshal were ordered to serve my summons, complaint, and process to the defendants.

6. On February 16, 1999, and on May 23, 2002, I registered a copyright with the Library of Congress to preserve and protect work I converted into a tangible expression because I was pitching the copyrighted work for film and/or television series production to film studios, production companies, and people in the entertainment business.

7. For added paper trail protection I registered the work with the Writer's Guild of America East which protects work for ten (10) years on February 3, 1999 registration number 124133 and again prior to expiration on January 28, 2009 registration number R25606.

8. That the copyrighted and copied story is fiction and facts.

9. That I submitted my copyrighted registered material to Black Entertainment Television, and producers of the American Gangster series prior to any signing of a performance/interview agreement with Frank Stinton.

10. I later discussed my copyrighted story with Frank Stinton and other producers, and co-producers prior to any signing of a performance agreement.

11. That Ving Rhames narration of the "Chaz Williams, Armed & Dangerous" episode was scripted and that was copied from from copyrighted protected materials.

12. That the producers and Black Entertainment Television did not independently create this story and did not independently gather or verify facts in this story, and copied my copyrighted work.

13. That the producers attempted to induce me to sign a open Freedom of Information Act consent form for the Federal Bureau of Investigation half way through the filming and production which I refused to do so.

14. That I am in the business of film production as was filed in my trademark application registered on July 27, 1999 as U.S. Trademark Registration No. 2264977.
15. That as early as 2000, I was in negotiation with Rockerfeller Films at a purchase price for my copyrighted story for two hundred thousand dollars, ($200,000) minimum, with box office bonuses, and five percent (5%) of net profits, producer credits and compensation as producer of one hundred, fifty thousand dollars, ($150,000).

16. That Black Entertainment Television was aware of my business due to a trademark dispute brought by Black Entertainment Television against me, in which I was deposed in Washington, DC at the demand of Black Entertainment Television, and which a subsequent agreement was signed on December 24, 2002, between Black Entertainment Television and my company.

17. That Black Entertainment Television breached that agreement in not providing equal treatment as a producer as is outlined in the December 24, 2002 agreement.

18. That I was not fairly treated or compensated as every other producer as defined in the agreement.

19. That I was informed by producers and Black Entertainment Television that this interview would be a cautionary message to the youth.

20. That I signed a general document customarily used in music video performances for artist, waiving compensation for my acting/performance. "Name of Artist" appeared prominently at the top of the agreement.

21. That this was the same general document signed by every other person who appears in speaking and non-speaking parts of this production, and who had no registered copyright, and who was not the subject of the story, and not reviewed by an attorney.

_Charles Williams_
Charles Williams,
Plaintiff

Dated: April 17, 2013

SWORN TO BEFORE ME, THIS 17th DAY, OF APRIL, 2013

_Regina Maher_
REGINA MAHER
Notary Public - State of New York
No. 01MA5039618
Qualified in Suffolk County
My Commission Expires Feb. 21, 2015

Page 2

BLACK ENTERTAINMENT TELEVISION AGREEMENT

## AGREEMENT

THIS AGREEMENT, is made by and between Black Hand Entertainment, Inc., a New York corporation located and doing business at 89-15 139th Street, Jamaica, New York (hereinafter referred to as "BLACK HAND") and Black Entertainment Television, Inc., a District of Columbia Corporation, located and doing business at One BET Plaza, 1235 W. Street, NE, Washington, DC 20018 (hereinafter referred to as "BET").

WHEREAS, BET owns U.S. Trademark Registration No. 1,801,105, registered on October 26, 1993, for the mark "BLACK ENTERTAINMENT TELEVISION" for cable television broadcasting services based upon its use thereof, since at least as early as January 25, 1980; and

WHEREAS, the parties acknowledge that the mark BLACK ENTERTAINMENT TELEVISION is widely used on a variety of goods and services, is recognized as originating with Black Entertainment Television, and BLACK ENTERTAINMENT TELEVISION branded programming is now broadcast to approximately 70 million homes; and

WHEREAS, BLACK HAND owns U.S. Trademark Registration No. 2,264,977, registered on July 27, 1999, for the mark "BLACK HAND" for entertainment services in the nature of music production and recording; video and film production; and party planning based on use thereof, since at least as early as August 5, 1996 (hereinafter "BLACK HAND Mark") and

WHEREAS, BLACK HAND filed U.S. Trademark Application Serial No. 75/197,765 on November 13, 1996 for the mark "BLACK HAND ENTERTAINMENT & Design" for "live performances by a musical band; music composition and transcription for others; live music concerts; audio recording and production; video broadcasting; motion picture film production and party planning" in class 41; based on use thereof since at least as early as August 5, 1996; and

WHEREAS, the parties are currently unaware of any actual confusion having resulted from their respective current uses of their respective marks and have reached Agreement respecting methods to be used to avoid confusion concerning prospective uses of their marks as specified herein; and

WHEREAS, the parties desire to avoid the expense of an ongoing Opposition proceeding, thus enabling both parties to continue to use their respective marks on their respective services and products;

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and between the parties as follows:

1. BLACK HAND agrees to withdraw with prejudice its Application Serial No. 75/197,765 for the mark BLACK HAND ENTERTAINMENT & Design. BLACK HAND further agrees not to seek registration of the mark BLACK HAND ENTERTAINMENT in typed word mark or word and design mark format, in the future.

2. BLACK HAND agrees that it shall only use the mark "BLACK HAND ENTERTAINMENT & Design" as a common law mark as provided herein. BLACK HAND further agrees not to use the BLACK HAND ENTERTAINMENT & Design mark in connection with television, cable or satellite broadcasting services. However, it is expressly agreed that BLACK HAND can provide content which is disseminated through television, cable or satellite media. BLACK HAND further agrees not to use the BLACK HAND ENTERTAINMENT & Design mark with an ® symbol, nor shall it otherwise indicate that the mark is a registered trademark. BLACK HAND further agrees to use the mark "BLACK HAND ENTERTAINMENT & Design" at all times only as shown as Exhibit A attached hereto and incorporated herein by reference. Specifically, BLACK HAND agrees that its common law uses of the mark BLACK HAND ENTERTAINMENT & Design shall be in connection with and immediately proximate to the "black hand breaking through ground" design as shown in Exhibit A.

3. It is understood and agreed that BLACK HAND will continue to operate its business as "Black Hand Entertainment, Inc." However, it is the intent and spirit of this agreement that all common law uses of the mark BLACK HAND ENTERTAINMENT & Design or the "Black Hand Entertainment, Inc." trade name in promotions, advertising or otherwise, which are directed to the public in whatever form, shall be accompanied in close proximity by the "black hand" design shown in Exhibit A hereto.

4. Not acknowledging that BLACK HAND's approval is required, but for the avoidance of doubt, BLACK HAND agrees that BET may use its mark BLACK ENTERTAINMENT TELEVISION or other such similar mark on and/or in connection with all manner of goods and services including, but not limited to, apparel, restaurants, foodstuffs, television programming, radio programming, Internet services, electronic commerce, direct mail, recordings, casinos, casino gambling, games and gaming, and live performances.

5. BLACK HAND agrees that this Agreement shall apply to its use of the BLACK HAND ENTERTAINMENT & Design mark, or any other similar marks, in the United States and world-wide. BLACK HAND further agrees that it will not register the BLACK HAND ENTERTAINMENT & Design mark, or any other similar mark containing the words "black" and "entertainment" in the United States or in any other country or community trademark office world-wide.

6. BLACK HAND further agrees to neither directly or indirectly oppose, seek to cancel, or otherwise interfere with BET's use and/or registration of BET's BLACK ENTERTAINMENT TELEVISION mark, or other similar marks, for any goods or services, including but not limited to the entertainment offerings as described above in clause 4, and BLACK HAND agrees to cooperate with BET to the extent reasonably necessary for BET to register or otherwise protect its marks.

7. BET agrees to pay half of BLACK HAND's legal fees resulting from this dispute or Two-thousand Dollars ($2,000), whichever is less.

8. BET agrees to offer BLACK HAND advertising rates on its cable television channel equal to prevailing market advertising rates for comparable companies or comparable sized advertising orders.

9. BET further agrees to afford Black Hand and its artists an opportunity, equal and similar to that accorded artists produced by any other production company, to promote, entertain, and display their artistry on and through BET shows such as, including but not limited to, Rap City, 106th and Park, Midnight Love, New York to LA, Uncut, CITA's World, Top 25 Countdown, Teen Summit, How I'm Living, Maad Sports, Hits from the Streets, Videolink, BET Music News, BET Radio Network, BET Awards and BET.Com Countdown.

10. In addition, BET agrees to afford Black Hand an opportunity to show its videos through BET video programming and video rotation, on a basis equal and similar to that accorded videos produced by any other production company.

11.  This Agreement is for the purpose of avoiding a likelihood of confusion between the parties' use of their respective marks. However, should any confusion occur in the future, then both parties agree to cooperate in good faith with each other and use their best efforts to eliminate any future likelihood of confusion in connection with either party's use of its mark consistent with this Agreement including, but not limited to, use of notations by BLACK HAND to the public that BLACK HAND's products and services are not associated with or sponsored by BET

12.  The parties, their parents, subsidiaries and attorneys agree to keep the terms of this Agreement confidential and will not release the substance of this Agreement to third parties without the written consent of the other party or subject to court order. It is expressly agreed that BLACK HAND shall be permitted to respond to direct third party inquiries regarding this matter as follows:

"Black Entertainment Television, Inc. and Black Hand Entertainment, Inc. have amicably resolved their trademark dispute. Black Hand Entertainment, Inc. will trade and provide services under the trademark BLACK HAND."

13.  The invalidity, illegality and unenforceability of any provision of this agreement shall not in any way affect, impair, invalidate or render unenforceable this or any other provision hereof, and any such invalid, illegal or unenforceable provision shall be regarded as severed from this agreement

14.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

15.  This Agreement sets forth the full understanding of the parties and supersedes all prior discussions, understandings and/or agreements, whether oral or written.

16.  This Agreement shall be governed by and construed according applicable Federal laws and to the laws of the District of Columbia, without respect to its choice of law provisions.

17.  Jurisdiction under this Agreement is vested solely in the District of Columbia.

18.  Any changes to this Agreement shall be effective only if made in writing and executed by duly authorized officers of each party.

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates set forth below.

BLACK ENTERTAINMENT TELEVISION, INC.

Date: 12/24/02

By: _____
Byron Marchant, Executive Vice President and CAO

BLACK HAND ENTERTAINMENT, INC.

Date: _____

By: _____
Charles Williams, President and CFO

**ATTORNEY NEGOTIATION LETTER**

**BOBBITT & ROBERTS**
Attorneys at Law

1620 26th Street
Suite 150 South
Santa Monica, California 90404
Telephone (310) 315-7150 Fax (310) 315-7159

VIRGIL ROBERTS
LEROY BOBBITT

JACQUE SHIRLEY

September 21, 200

**VIA FACSIMILE: 310.859.2788**
David Feldman, Esq.
Bloom, Hergott, Diemer & Cook, LLP
150 South Rodeo Drive, 3rd Floor
Beverly Hills, CA 90212

Re: "Inside Out"

Dear David:

I have reviewed our discussion with our client Charles Williams regarding the interest of your client Rockefeller Films in producing a theatrical motion picture based on the above-referenced project and would like to propose the following:

1. Twenty five thousand dollars ($25,000.00) for a twelve (12) month option;

2. A purchase price of Two hundred thousand dollars ($200,000.00) increasing as follows based upon the final budget for the Picture:
   (a) $250,000.00 if the budget is more than $7,000,000.00 but not more than $10,000,000.00;
   (b) $300,000.00 if the budget exceeds $10,000,000.00

3. Box Office Bonuses as follows:
   (a) $25,000.00 at Box Office of $20,000,000.00
   (b) $25,000.00 at Box Office of $25,000,000.00
   (c) $25,000.00 at Box Office of $30,000,000.00
   (d) $25,000.00 at Box Office of $35,000,000.00

4. An amount equal to five percent (5%) of one hundred percent (100%) of net profits, provided that, if Rockefeller receives a participation in gross receipts or adjusted gross receipts, we would negotiate a participation in gross or adjusted gross comparable to such 5% of net.

5. Charles Williams would be engaged as a producer on the picture with appropriate credit and cooperation of $150,000.00

6. Charles would have script approval.

7. Black Hand Entertainment would joint venture the soundtrack album with Rockefeller and have the right to place three (3) songs on such soundtrack album featuring acts signed to its label and to receive credit and have its logo on the album

As stated, Charles does not wish merely to sell the story but to be intimately involved in the entire project.

I look forward to hearing from you soon.

Best regards,

LEROY BOBBITT

LB/yes

cc: Charles Williams
    Ed Woods
bcc: Virgil Roberts

## CERTIFICATE OF SERVICE

CHARLES WILLIAMS,
BLACK HAND ENTERTAINMENT,
          Plaintiffs

-vs-                                                                                CV-13-1459(JS)(ETB)

VIACOM, BLACK ENTERTAINMENT TELEVISION NETWORKS
A&E TELEVISION NETWORKS
APPLE COMPUTER INC
NETFLIX CORPORATE
AMAZON CORPORATE
A.SMITH & CO. PRODUCTIONS,
          Defendants

I, Charles Williams, hereby certify that defendants listed hereafter, and the law office of Greenberg Traurig, LLP, 1840 Century Park East, Suite 1900, Los Angeles, CA 90067, have been served Plaintiffs opposition to dismissal for Viacom, Inc. and A & E Television Networks, in the above captioned matter thru the United States Postal Service.

                                                               Charles Williams, Pro se
                                                               Black Hand Entertainment
                                                               Plaintiffs

SWORN TO BEFORE ME, THIS __6__, DAY, OF JUNE, 2013

JENNIFER PROVIDENTE
Notary Public - State of New York
NO. 01PR6260419
Qualified in Nassau County
My Commission Expires 4/30/16